```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT

OFFICEMAX INCORPORATED,           :
                                  :
        Plaintiff,                :
                                  :
        v.                        :    Case No. 2:11-cv-21
                                  :
W.B. MASON CO., INC. and          :
WILLIAM H. RAMSEY,                :
                                  :
        Defendants.               :
                                  :
```

**MEMORANDUM and ORDER**

Plaintiff, OfficeMax Incorporated, has moved for reconsideration of this Court's Memorandum and Order of February 18, 2011, denying its motion for a temporary restraining order and preliminary injunction.  Mot. to Recons., ECF No. 36.  Familiarity with the Memorandum and Order is assumed.  Defendants W.B. Mason Co., Inc. and William H. Ramsey have moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56(a).  Mot. to Dismiss or for Summ. J., ECF No. 38.  For the reasons that follow, the motion to reconsider is **denied** and the motion for summary judgment is **granted**.

**Factual and Procedural Background**

William Ramsey went to work for McAuliffe, Inc. ("McAuliffe") in 1983.  McAuliffe sold office supplies and office equipment and also serviced and maintained office equipment.

Ramsey began working in the McAuliffe warehouse.  In approximately 1990, he began working in sales.  Over the next five or six years he successfully developed customers for McAuliffe.

In 1996, the owners of McAuliffe agreed to sell the company to Boise Cascade Office Products Corporation ("BCOP") via a stock sale.  In connection with the sale, McAuliffe asked Ramsey to sign a "Confidential Information and Noncompetition Agreement" ("the Agreement").  Ramsey signed the Agreement on February 6, 1996.

The Agreement, ECF No. 6-1, provided that Ramsey was executing it in contemplation of the BCOP acquisition of McAuliffe, and that Ramsey intended that his "obligations, duties, and promises in this Agreement" were for the benefit of BCOP.  *Id*.  Under the Agreement, Ramsey acknowledged that he would accept employment with BCOP after the acquisition, agreed not to divulge McAuliffe's confidential information, and promised to continue to treat such information as confidential after the termination of his employment with McAuliffe.  *Id*.

The Agreement also provided that

> [f]or a period of 12 months after termination of my employment with McAuliffe (or for a period of 12 months after a final judgment or injunction enforcing this covenant), I will not . . . engage in the sale or distribution of office supplies, office furniture, or related office products or services, engage in the sale of janitorial supplies, or otherwise engage in the type of work that I presently perform for McAuliffe within

> sixty (60) miles of any county in which I performed services for McAuliffe in the 12 months prior to my termination of employment. In agreeing to this restriction, I specifically acknowledge the substantial value to McAuliffe of my customer contacts and agree that such contacts constitute goodwill and a protectable interest of McAuliffe.

*Id.*

The Agreement also provided that it would be freely assignable by McAuliffe to BCOP and that, if requested to do so, Ramsey would "sign a noncompetition agreement in substantially the same form as this Agreement and which names BCOP as the employer." *Id*. The Defendants argue that there was never an assignment of the Agreement, while OfficeMax argues that the Agreement was assigned as part of the stock sale. It is undisputed that BCOP never executed a noncompetition agreement with Ramsey naming BCOP as the employer.

Over Ramsey's signature was an acknowledgment that he signed it with the understanding that the terms were a "condition of [his] employment with McAuliffe[,]" which "controll[ed] his use of certain information and know-how during and after [his] employment with McAuliffe" and "restrict[ed] [his] employment opportunities upon termination of [his] employment with McAuliffe." *Id*.

Ramsey accepted a job at BCOP in 1996. In 2004, BCOP changed its name to OfficeMax, Inc. Ramsey continued to work for OfficeMax as a sales representative until November 2009, when, as

3

part of a reorganization, the entire New England sales force was advised that their positions, as previously defined, were being eliminated. All sales representatives were invited to apply for new positions at OfficeMax; if they did not, they were advised that they would no longer be working for OfficeMax. As a result of the reorganization, 60 to 70% of the sales force were offered employment; the remainder were no longer employed with OfficeMax.

After applying and obtaining an interview, Ramsey was offered one of the new positions in sales on November 16, 2009. His new position required him to meet a quota of large customers, meaning customers buying more than $50,000.00 worth of products. Ramsey believed that such customers were scarce in northern New England, and that it would be difficult to meet his quota.

Eventually Ramsey accepted a job offer from W.B. Mason and resigned from OfficeMax on February 26, 2010.

On January 21, 2011, OfficeMax filed this lawsuit, alleging that Ramsey's acceptance of employment with W.B. Mason in 2010 violated his noncompetition obligations under the Agreement and seeking injunctive relief. *See* Compl., ECF No. 1. On January 31, 2011, OfficeMax filed a motion for a temporary restraining order and preliminary injunction. ECF No. 6. In a Memorandum and Order dated February 18, 2011, the Court denied OfficeMax's motion because the plain language of the Agreement indicates that Ramsey's noncompetition obligations expired in 1997, one year

after the termination of his employment with McAuliffe.  ECF No. 36.

## I. Motion to Reconsider

<u>Legal Standard</u>

It is well settled that "[t]he standard for granting a motion to reconsider is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  "A motion to reconsider should not be granted to relitigate an issue already decided."  *Id.*  "'Motions for reconsideration must be narrowly construed and the standard strictly applied to discourage litigants from making repetitive arguments on issues that have been thoroughly considered by the court, to ensure finality, and to prevent the practice of a losing party examining a decision and then plugging the gaps of the lost motion with additional matters.'" *Lewis v. Rosenfeld*, 145 F. Supp. 2d 341, 343 (S.D.N.Y. 2001) (quoting *Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 130 F. Supp. 2d 440, 443 (S.D.N.Y. 2000)).  However, a motion for reconsideration should be granted where "it becomes necessary to remedy a clear error of law or to prevent obvious injustice." *Walker v. Teachers Ins. & Annuity Ass'n of American Coll.*, No.

1:09-CV-190, 2010 U.S. Dist. LEXIS 78604, at *5 (D. Vt. Aug. 4, 2010) (quoting *Hester Indus., Inc. v. Tyson Foods, Inc.,* 160 F.R.D. 15, 16 (N.D.N.Y. 1995)).

Discussion

    OfficeMax has not identified any controlling decisions or data that were not before the Court when it denied the motion for a temporary restraining order and preliminary injunction.[1] Instead, it simply argues that "the Court erred as a matter of law in construing the 'plain meaning'" of the Agreement that Ramsey signed in 1996.  Mot. to Recons. 2.  Specifically, OfficeMax argues that Court "misconstrued the phrase, 'after termination of my employment with McAuliffe' to refer only to McAuliffe and not to BCOP, and by further concluding that the [one-year] obligations concerning noncompetition addressed therein began to run upon the closing of the stock sale in February 1996."  *Id*.  OfficeMax suggests that, in construing the Agreement, the Court should read references to "McAuliffe" to mean BCOP in light of prefatory language which states that Ramsey entered into the contract "intending that [his] obligations, duties and promises in this Agreement are for the benefit of BCOP."  Agreement, ECF No. 6-1.  It argues that reading

---

    [1] In fact OfficeMax appears to have copied and pasted substantial portions of text from its earlier briefing on the motion for a temporary restraining order and preliminary injunction into its motion to reconsider.

"McAuliffe" to mean McAuliffe, and not BCOP, leads to "absurd" results, Mot. to Recons. 6, because this would mean that BCOP, through McAuliffe, paid Ramsey $2500 for the following:

(1) "a duty to develop and maintain good relationships between McAuliffe and its customers" which lasted only three days (the period of time between when Ramsey signed the agreement and when the stock sale was complete), Agreement ¶ 1;

(2) an agreement not to divulge McAuliffe's confidential information regarding its customers to anyone, including BCOP, *id*. at ¶ 2;

(3) an agreement to return all written materials supplied to him by McAuliffe on the date of the stock sale, when his employment with McAuliffe ended and his employment with BCOP began, *id*. at ¶ 3; and

(4) an agreement not to perform the type of he work he was performing for McAuliffe for any other entity for 12 months from the date of the stock sale. *Id*. at ¶ 4.

OfficeMax asserts that, in light of principles of contract interpretation that require courts to avoid construing contracts in ways that "result[] in patently absurd consequences," the Court must read references to "McAuliffe" to mean "BCOP" instead of simply adopting the plain meaning of the words used in the contract language. Mot. to Recons. 5-6 (quoting *United States v.*

*Brown*, 333 U.S. 18, 27 (1948)).

Ramsey points out that effectuating the plain language of the Agreement, by reading "McAuliffe" to mean McAuliffe and not BCOP, does not lead to absurd results if one considers that the contract's intended purpose may have been to provide temporary protection for BCOP before and for a short time after the stock sale. *See* Opp'n to Mot. for TRO & Prelim. Inj. 8-9, ECF No. 23. In this vein, ¶ 1 of the Agreement would have required Ramsey to maintain good customer relations during the period between the signing of the Agreement and the stock sale,[2] while ¶ 2-4 would have prevented him from working for and/or divulging proprietary information to any competitor for one year from the date of the stock sale. While OfficeMax points out that, under this plain-language reading, the terms of the contract would have prohibited Ramsey from sharing proprietary information even with BCOP and would have required him to turn in all McAuliffe-issued written materials at the time of the stock sale,[3] it is also true that

---

[2] OfficeMax has not identified any information in the record before the Court suggesting that BCOP and McAuliffe knew with exact certainty when the stock sale would be completed at the time Ramsey signed the Agreement. Even if the contracting parties expected that this interval would be short, it cannot be said that requiring Ramsey to maintain good customer relations during that period was of no benefit to BCOP since BCOP obviously intended to try to keep the business of many of McAuliffe's customers.

[3] At a hearing on the motion for a temporary restraining order and preliminary injunction, Ramsey testified that he did not in fact surrender the McAuliffe-issued property at the time

BCOP, which OfficeMax asserts was assigned all contractual rights by virtue of the stock sale, was the only party in a position to attempt to enforce these provisions.  In other words, the plain language of the contract, rather than leading to absurd results, did provide BCOP with a measure of protection for the year following the stock sale.  During that period, BCOP could have sought to enforce those provisions if Ramsey had attempted to work for or to share proprietary information with a competitor.  Alternatively, BCOP was free to choose not to enforce the Agreement's provisions so long as Ramsey continued to work at BCOP during that year.

Undoubtedly, one can imagine more precisely-worded contracts that would have had the same effect as this one, as well as contracts that simply would have been more beneficial to BCOP by requiring Ramsey to agree to a longer period of noncompetition.  Nevertheless, the fact that, *ex post facto*, one party can imagine iterations of a contract that would have been more beneficial to it is not a sound basis for refusing to effectuate the plain meaning of the contract as actually written.

Furthermore, as the Court explained in the Memorandum and Order of February 18, 2011, the Agreement's assignment clause confirms that it was the intent of the contracting parties for

---

his employment with McAuliffe ended and his employment with BCOP began.

the restrictions on Ramsey's employment to end twelve months after termination of his employment with McAuliffe rather than twelve months after termination of his employment with BCOP or any other successor employer.  That clause reads, "I further agree that if requested by BCOP, and for the consideration stated above, I will sign a noncompetition agreement in substantially the same form as this Agreement and which names BCOP as the employer."  If the contracting parties truly had intended the noncompetition restrictions to end twelve months after termination of Ramsey's employment with BCOP, this sentence would make little sense since a second agreement in "substantially the same form as th[e] [first] Agreement," but "nam[ing] BCOP as the employer[,]" would do no more than what OfficeMax claims the original Agreement did.  *See Northern Security Ins. Co. v. Mitec Elec., Ltd.*, 2008 VT 96, ¶24, 965 A.2d 447 (courts should "strive to avoid" readings that would "render portions of [contracts] mere surplusage").  Moreover, that the contracting parties were able to envisage a non-competition agreement "naming BCOP as the employer" makes clear that, if they had intended to, they easily could have indicated in the original contract that Ramsey's noncompetition obligations would begin to run at the time of the termination of his employment with BCOP and not McAuliffe.

"[I]f an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its

terms." *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust*, 375 F.3d 168, 177 (2d Cir. 2004); *see also KPC Corp. v. The Book Press, Inc.,* 161 Vt. 145, 150, 636 A.2d 325, 328 (1993) ("Where the terms of a [contract] are plain and unambiguous, they will be given effect and enforced in accordance with their language."). Here, the plain language of the Agreement clearly indicates that Ramsey's noncompetition obligations were to run for a period of one year following the termination of his employment with McAuliffe. Because OfficeMax has not offered a compelling reason that the Court should depart from the plain and unambiguous language of the Agreement at issue in this case, let alone shown that the Court erred as a matter of law in giving effect to that plain language, the motion to reconsider is **denied**.[4]

---

[4] In the motion to reconsider, OfficeMax also argues that the Court erred in concluding that "it is undisputed that McAuliffe never issued a written assignment of the Agreement to BCOP," and that Ramsey's initial term of employment with OfficeMax terminated in 2009, when his position was eliminated and he was rehired into a new position. Mot. to Recons. 8-12. These arguments do not bear on the Court's ultimate conclusion that, under the plain language of the Agreement, Ramsey's non-competition obligations expired in 1997, one year after his employment with McAuliffe terminated.

## II. Motion for Summary Judgment[5]

Legal Standard

Summary judgment is "'warranted upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 455 (2d Cir. 2007) (quoting *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004)); Fed. R. Civ. P. 56(c).  "In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006).

Discussion

OfficeMax argues that summary judgment is inappropriate at this juncture because "the complexity of the relationships between the parties and transactions themselves give rise to many contested factual issues, some of which arise simply from discerning the intent of the parties."  Opp'n to Mot. to Dismiss or for Summ. J. 3, ECF No. 40.  Rehashing the same arguments made

---

[5] Defendants' motion is styled as a motion to dismiss or, in the alternative, for summary judgement.  Because OfficeMax, in opposing the motion, has presented matters outside the original pleadings, the Court treats the motion as one for summary judgment.  Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

in its motion to reconsider, and in its motion for a temporary restraining order and preliminary injunction before that, OfficeMax asserts that the Court should depart from the plain language of the Agreement by reading references to "McAuliffe" to mean BCOP because doing so would give effect to the true intentions of the contracting parties.  However, basic principles of contract interpretation make clear that the Court is not at liberty to delve into contested issues of intent where a contract itself is unambiguous, as the Agreement is here.  "If [an] instrument is clear and unambiguous, it is to be given effect according to its language, for the intention and understanding of the parties must be deemed to be that which their writing declares."  *Randall v. Clifford*, 122 A.2d 833, 837 (Vt. 1956); *see also Eternity Global Master Fund Ltd.*, 375 F.3d at 177 ("[T]he best evidence of intent is the contract itself; if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms." (internal citation omitted)).

"Interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."  *Trustees of the 1199/SEIU Greater N.Y. Benefit Fund v. Kingsbridge Heights Rehab. Care Ctr.*, 405 Fed. Appx. 520, 523 (2d Cir. 2010) (citations omitted).  "The question of whether there is an ambiguity is also a matter of

law." *Id*.  As explained *supra*, the unambiguous language of the Agreement indicates that Ramsey's noncompetition obligations were to run for a period of one year following the termination of his employment with McAuliffe in 1996.  Therefore, as a matter of law, OfficeMax cannot prevail in this lawsuit, which alleges that Ramsey breached the Agreement in 2010 when he accepted employment with W.B. Mason.[6]  The Defendants' motion for summary judgment is **granted**.

---

[6] A significant portion of OfficeMax's opposition to the summary judgment motion is devoted to arguing that there was an assignment of the Agreement from McAuliffe to BCOP by virtue of the stock sale, a contention which the Defendants dispute.  Even if one assumes that the Agreement was assigned to BCOP and, in turn, to OfficeMax, this does not alter the disposition of the summary judgment motion.  The assignment clause of the Agreement may only assign that to which Ramsey agreed.  *See, e.g.*, *In re Ambassador Ins. Co.*, 2008 VT 105, ¶19, 965 A.2d 486 ("The common law generally presumes that an assignee takes whatever interest the assignor promised.") (citing *Hebert v. Jarvis & Rice & White Ins., Inc.*, 134 Vt. 472, 476 (1976) (explaining that the assignee succeeds "only to such rights as were possessed by the assignor at the time of the assignment")); *see also Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 676 (2d Cir. 2009) (noting the "familiar proposition that an assignor could only assign a right that it legally possessed and an assignee's rights are no greater than those of the assignor") (quotations omitted).  Accordingly, even assuming that OfficeMax now stands in BCOP's shoes and may enforce the Agreement, all it may enforce are the restrictions that followed the termination of Ramsey's employment with McAuliffe in 1996.  Because these restrictions expired in 1997, they have no bearing on Ramsey's employment with W.B. Mason, which began in 2010.

Dated at Burlington, in the District of Vermont, this 2nd day of June, 2011.

                                          <u>/s/ William K. Sessions III</u>
                                          William K. Sessions III
                                          U.S. District Court Judge